Good morning. May it please the Court, James Straya for the CAKE Law Firm on behalf of Appellants. Now, today the Court's decision is not one whether to reverse the Court's order below, but how. This is because the Court granted both a 12b-1 dismissal on Article III standing as well as a 12b-6 dismissal on the merits. The Court couldn't do both. I think the Court erred in doing both and should have found Article III standing as well as found that the complaint The injury here Counsel, let me just ask you one point to address, please, at some point in your argument. On the class action dismissal, the District Court relied on a concern about California law being applied nationwide. And maybe that concern is blown out of the water by a possibility of a California subclass. However, we can affirm on any basis supported by the record, and I'm pretty deeply concerned as to how a person who was given a credit and didn't pay the alleged bad charges could be a class rep for people who had those charges and paid them, didn't get refunds. I just don't see the class action being viable here. So in your argument, at some point, maybe you could address that. Sure, and I'll do it now if it's all right. And I'm not – if I understand the Court, I thought the Court first was going to the question of whether or not there could be a class action based on California law on the case. But instead, it seems that at the end, the Court had the injured standing to pursue a class action. And with respect to standing to pursue a class action, I think the Court's premise upon its – it bases the question is that – Not so much standing. And my concern is not so much standing, but whether the requirements of Rule 23A would be satisfied by a person who got a refund. Okay. The – first, that issue wasn't raised by the appellees, and I appreciate that. But nonetheless, I'll do my best to address the Court's question and whether it's one of adequacy or one of typicality. With respect to adequacy, the test is whether or not the plaintiff has any conflict of interest. Here, there is no conflict of interest between the plaintiff and the defendant. There's no relationship. She's a consumer. The defendant is a defendant. They're not a supplier in some kind of chain of distribution where she's not in the middle of a Ponzi scheme or something like that. And so I don't think it's a question of adequacy of representation. She certainly has prosecutorial authority. Maybe I was thinking more about typicality. Sure. If the class is people who've paid this charge, how can a person who got a refund be typical of that? And also, if her damages are that she didn't work, you know, four hours because she was clearing up the claims and she gets $175 an hour for that, that likely is not typical of the average person, you know, who may have received this charge. I appreciate the Court's concern. With respect to typicality, the Court needs to understand that plaintiff did. She did pay $1760 on April 25, 2005, and this was after, after the defendant claims that they refunded the money to her. There couldn't have been any refund because Ms. Sisley, the plaintiff here, did not pay anything until after that money came to her account. So there has been never, subsequent to the payment by plaintiff, any refund of that $17 that she paid. And therefore, we will contend that she has been unrecompensed for that amount of money because the defendant said, well, we were good. We were trying to be helpful. Out of goodwill, we gave her even more. We gave her $5260. Well, we will take the position that that $52 that they claimed they paid before she paid anything was, in effect, an attempt to provide goodwill to compensate for her loss of time, perhaps partially, or to try to pick off our plaintiff from being able to represent a class. And I think the public policy interest here, and it's true when the court looks at issues of adequacy and typicality, is when a defendant attempts to pick off the defendant after filing a lawsuit by paying that plaintiff a refund, that does not somehow render that plaintiff no longer able to further continue the action. And, in fact, I believe that the issues of adequacy and typicality are one that is vested in the trial court below, on the motion for class certification, where we can undertake discovery, figure out who the class really is, what are the other types of damages for the other class members. And I would also note, of course, because the issue wasn't raised and I haven't cited the cases here, that courts do not find typicality does not exist because of differences in damages. Typicality focuses on whether or not the legal theories, the legal theories are typical. There may be some variation with respect to the damages that each different class member suffered, but as long as the class representative's claims, her legal theories, are typical of the other members in the class, then typicality is satisfied. Typicality does not require even identical legal theories, as long as they're similar. And there's a coherency there. And, therefore, I posit to the Court that below, if we do go back to the Federal Court here, that the Court under governing jurisprudence with respect to both adequacy and typicality on Rule 23 would find that our plaintiff was sufficient under both. Just following up, this is not a class question, but on your theory about how the funds that were given to your client in advance don't count as reimbursement. I have some real trouble with the, particularly with the unjust enrichment claim, how your client could claim that she was, that Sprint was unjustly enriched when at least certainly she was made whole or even more than made whole. There was no profits that Sprint made off of this interchange. I recognize the Court's concern with respect to unjust enrichment. However, we have, it's really an issue that's one for the jury, ultimately, with respect to her individual claim with respect to unjust enrichment. Here we're claiming that they unjustly enriched themselves after they paid that $52 by taking out of her pocket, without authorization, that $1,750. That $1,750 was an unjust enrichment. They had no right to take that money from her. They were unjustly enriched by that. In an equitable action, given that, they clearly expressed their intent to make her whole through giving her that advance payment. It's hard to understand what would be the disputed issue. Well, in equity, there's also the doctrine of unclean hands. We would argue to the trial court who would be making this weighing of the equities that because they had unclean hands by improperly taking that $1,750 from her, they should not be somehow rewarded by having previously given her $52 when that $52, they claim, was the gesture of goodwill to keep her quiet and make her go away. And then to say, oh, here, I'll put that $52 in one pocket, and I'll take this $1,750 in this other pocket without your authorization, you would claim that that's unjust enrichment. And one of the conditions, problems we have is Article III standing. And I'd like to get your view on that. When your adversary stands up, I'm sure she's going to say that there's really no economic harm shown here. And one of the issues, of course, is litigation costs, but I think you may have a problem getting around Walker in that one. And that brings me to the time of law or loss in making phone calls trying to make it right. An argument can be made that this is just routine annoyance, that it's de minimis, and therefore it's really not an economic cost to the fact of life in this complex society. And I'd like to have your response to that. Why shouldn't we treat the time of making phone calls to get the phone company or somebody else to properly account on my bill as just one of those de minimis routine annoyances? Your Honor, in life, there's a lot of routine annoyances, but when a consumer contracts with the defendant and has a contract with that company and there's a set of rights that are created between that company and that consumer, a violation of those rights is not simply an annoyance. It's a breach of contract. A breach of contract is a violation of a property right. That consumer has a bundle of contractual rights, and that defendant in this case took one of those rights away. It's not simply a matter of annoyance. It's a matter of violation of breach of contract. In fact, this Court in Cantrell and also in Beamon has consistently held and certainly made it clear that this Court's position is that the Court looks to state law to determine the source of Article the existence of Article III standing when the nature of the claim is based on state law. Now, if we have a lot of these, for example, I have some bank accounts and I have signed a little contract with the bank, if every time they have somehow made a mistake and I'm going to call them, that would be the type of economic damage that I could then bring a class action for. Your Honor, if there's a breach of contract in your deposit account and then they overcharge me a dollar. A dollar, whether it be a penny, it's fine. The rule is for Article III standing that even a trifle is sufficient. Article III standing isn't a question of degree. It's a question of kind. And in fact, I believe Justice Gold has written in a concurring opinion in a global warming case that Article III standing, the law rejects the idea that you need some minimum economic harm to be sufficient for Article III standing. And so whether it be a dollar or a penny, if they do it to everyone, a consumer will suffer maybe a penny or a dollar, but what about the defendant? What's the purpose of class actions? When we have a defendant that cheats a consumer out of a penny or a dollar, the defendant gets rich. That's why we have these class actions. And in fact, Your Honor, that's why state legislatures didn't rely on common law fraud or common law breach of contract. But instead, state legislatures said these common law rights aren't enough to protect consumers because, you know, for whatever reason, it might not be enough. Whatever the defendant's wrongdoing was might not be enough to allow that consumer to bring those common law rights. Therefore, they pass a consumer protection statute. And in fact, the Supreme Court in New Mexico in one of our cases that we cite said that one of the reasons why they enacted these consumer protection statutes and gave consumers minimum statutory damages was because they recognized consumers have to go around spending time and their own money sometimes to fix what the defendants are doing wrong, violating their rights. And therefore, that's why they give them statutory damages in recognition that maybe their loss of time can't be easily quantified, but at least they have a right to statutory damages, and that's a right. There is a remedy, and that's Article III standing. Now, often the cases, and I did a lot of research and found the Court quite a number of cases which have in fact recognized loss of time, sometimes among other types of damages, but including loss of time. And in fact, even courts have looked at loss of time when they're construing and trying to calculate the amount of minimum Federal court jurisdiction to get to the $5 million number. So the courts have recognized repeatedly that loss of time is something that is sufficient for Article III standing, and in fact have actually done so. Now, the defendant failed to even cite to this Court one case that held to the contrary. And therefore, this Court, looking at all of those cases, would find itself on certainly the majority, and I would argue the only side of the position with respect to loss of time, if it found that there was Article III standing even just based on loss of time. But we don't have just loss of time. We have the $17 that was taken from her account, which is economic injury. We have the breach of contract, and the fact that he even went so far as to disconnect her services because she didn't pay something that she wasn't required to pay, and they below said, well, this was a benefit, this offering of services, the fact that she didn't cancel and terminate meant that she continued the benefit of having this option out there that she could exercise if she wanted. But then they say, well, the fact that we disconnected your service and we deprived you of that option isn't enough for Article III standing, which is an entirely inconsistent position. And in fact, just the breach of contract itself is a deprivation of your property right, your contractual right, and is not for Article III standing. And then you even have the violation of the statutory rights, the CLRA, and if we go under a choice of law analysis and enforce their choice of law clause that they put into the contract for Kansas that they failed to recognize when they tried to argue class action. You have a situation and cases that have actually held in the context of a defendant attempting to collect wrongfully from a consumer that the fact that they attempted to collect, and even if they didn't get a penny from you, the fact that you had to ask your grandson, who was an attorney, to call him up and tell him to stop, it was enough to be construed to be aggrieved under the Kansas Consumer Protection Act and have, therefore, standing to prosecute a claim under Kansas' Consumer Protection Act. Let me ask you a question. I'm concerned about the issue you just made. It's a very good argument about this diminishment. But I want to point out one case, Gaff, versus Leigh Meridian. It's a precarium opinion, and my colleague, Judge Gould, was on that case. And in that case, Leigh Meridian indicated that delay in providing him with a roll-in and shower chair was sufficient and filed a complaint. And we held there that it was insufficient. There may have been damages. And then refers to the de minimis maximum. So according to this case, there is a point where it becomes de minimis. That is, your argument was it always counts, a penny counts. But I'm not sure I could square this with our case here, so I'd want to have you respond to it. Thank you, Your Honor. And I do know it's a relatively recent opinion, November 2007, I believe. Now, the court, I believe in pausing the question, represented that there was a holding by the Ninth Circuit on that. My position in my reading of it was that it was simply dicta, because what they're saying to you is that it's a Well, could I disagree with that? Since I was on the panel, I think you can address this and argue it. But it was clearly the case that SCAF went to the hotel, asked for a shower, an accessible room with a roll-in shower. They didn't have it at the start. They put it in a different room. You had to make calls. They got in the right room later that night. And, you know, we I think that our opinion squarely, squarely holds that his ADA damage claim on that issue was de minimis. And, you know, cited the ancient Roman law maxims that, you know, the law doesn't stoop to trifles. And, you know, cases where the Supreme Court said the same. So I don't I mean, you can argue it's a dictum. But I think at least as one member of the panel, I think it was pretty square in holding. I also say it was nice of you to mention my Covington concurrence on standing on global warming. Of course, that wasn't an opinion of the court. That was a separate individual opinion that's never made it to the ozone level. So. Well, hopefully we're here today, Your Honor, because I do believe that while I, of course, appreciate the court's insight as to the panel, the way I read the SCAF opinion is that the court found that there was Article 3 standing based on the general conclusory allegation that the plaintiff met with barriers to access. Now, I would posit that the one general barrier of access arguably would have been the shower issue. And therefore, that's why when I read it, I interpreted it as dictum, because the question was whether or not there was Article 3 standing, not the question of whether or not the plaintiff had the merits issue as to whether or not the plaintiff had damages, because of the denial for an hour with respect to the bathtub and then a few more hours with respect to the shower bars to help the plaintiff use the shower. Now, I also would note for the court that in my reading of it, it seemed that the court was implying or suggesting that the plaintiff was only intending to use the shower in the morning, and therefore, if the shower issue was resolved in the afternoon by 5 o'clock in the evening or something, there was really no barrier to access to take a shower, because by the time morning came and the plaintiff wanted to take a shower, there was no barrier to access. And therefore, I would read it to be holding that if there's a barrier to access that was a real barrier to access, then that would be enough. But if there really wasn't a barrier, because, you know, once you walked through and opened the door, you could actually use it, then that would be enough. But if there was no barrier, and therefore, no violation of the ADA, as opposed to trying to resort to the old legal maxim, which sounds beautiful, but if you actually looked at it, you have to ask yourself, well, what is the lex? Here, the lex is California and Kansas, which certainly do interpret mere trifles to be a trifle enough. Take and holds it is. Under Kansas Consumer Protection Act, is it trifle enough? Well, in particular. Kennedy. That's a different issue on the statute. I'm talking about the dollar amount. And there, as we begin that discussion, the question, the district of Kansas, which has suffered an injury, in fact, so they were focusing on Article 3. They were focusing on amount. Your response is that they're under very permissive statutes in Kansas and California. They get they get into standing. And I understand that. That's a separate argument. But I was only and I understand your argument that that's clear in the brief. I was just wondering about whether or not there is a point in which the court could say that it just doesn't it's too small. Well, Your Honor, if the court I suppose, you know, I don't I don't have a position. Well, I have a position on that, but I'm guided by the law here. Sure, Your Honor. And I appreciate that. And I hope that if the court would the court, I think, would benefit itself if it viewed that language in staff as dicta. And the reason is this, because if it did hold that the maximum applies to Article 3 standing and that a trifle wasn't enough, then the court would find itself irreconcilably in conflict with many circuit courts, including Eighth Circuit and Third Circuit, I believe, who have repeatedly held that a trifle is enough. And in fact, Justice Gold will find himself a little bit difficult in reconciling such a holding with his concurrence in the global warming case where he said there's no minimum measure of economic harm that's required for Article 3 standing because, you know, a penny is enough or a dollar is enough. And certainly courts are repeatedly hold that you don't even need economic harm. So the issue of whether it's a trifle is a question of damages. And that's why we have the Supreme Court in Doe and then we have the Tenth Circuit in Denny and then a more recent circuit decision in Jackson that they make the distinction between damages on the one hand and standing on the other hand. And so if you weigh, you start weighing the injury, okay, that's an issue of damages, a penny versus, okay, $52.50, you know, that's a damages issue, as opposed to, well, you took my penny, you got, you can go to the courthouse, now whether you can convince a jury as to whether or not you get damages, go at it, but at least you can open the door. I know you've been responding to our questions, but you are way over time. Do you have any more questions? No, I don't have anything. We'll give you a minute for rebuttal. I'm happy to field the questions, and I think our position is well laid out in our briefs, and I do appreciate the Court's time and questions. Thank you. Thank you. Good morning, Your Honors. May it please the Court, my name is Valerie Alter of Shepard, Mullen, Richter & Hampton on behalf of Sprint Communications Company, LP. Your Honors, despite what plaintiff would have you believe, this is a very simple case. Plaintiff contested certain charges on her Sprint long-distance bill, her fiancé called Sprint on her behalf, and Sprint issued her a credit of almost three times the contested charges. She lacked injury in fact, and the District Court properly dismissed her claim pursuant to Federal Rule of Civil Procedure 12b-1 for lack of standing. Could you move the microphone, please? Sure. Over, left, that, maybe it'll work better. Sort of ease over to one side or the other. Okay, here. Is this better? That's a good side. Okay. Plaintiff attempts to cover up this lack of standing by alleging that lost time, for example, is sufficient to confer Article III standing. No Federal Court has held that lost time alone is sufficient to confer Article III standing, and with good reason. Were this the law, a plaintiff, as Judge Wallace has pointed out, would have standing for calling the defendant to attempt to work out a problem before filing suit, speaking with his lawyer, worrying about the case. Any time spent even considering an issue would be enough to confer standing. This would completely get rid of Article III's gatekeeping function and allow any case to be brought in Federal Court. Can you address the CLRA claim and whether she has standing based on a violation of the statutory rights? Sure. Now, the CLRA claim, Your Honor, I believe you're referring to the Kagan case. And that case, I believe, can be factually distinguished from our case here because in that case, the defendant attempted to pick off the plaintiff. Attempted to do what? Attempted to pick off the plaintiff, the class representative, after suit had been filed by paying her off. That is clearly not what happened here. Despite counsel's insinuations, Sprint gave the plaintiff the credit well before there had been any talk of actions, class actions or otherwise. And in Kagan, I can read you the relevant portion of the Court's opinion. The Court says, We agree that a consumer who has notified a prospective defendant of an individual grievance and has obtained his or her requested relief cannot subsequently bring either an individual or a class action under the Act. That's exactly what happened here. Then the Court goes on to say, That's exactly what Sprint does. The Court then goes on to say, Similarly, a prospective defendant receiving notice of a grievance which affects a class of consumers, which would have required Ms. Sisley to send a CLRA letter to Sprint, asserted on behalf of a class, at that point had Sprint simply paid Ms. Sisley, then there would still be standing, at least with respect to the class action under California law, perhaps not with respect to Article III because the issue is one of picking off the plaintiff. Well, if you restrict your theory to that, then it sounds very, very helpful. But it seems to me that in the CLRA you don't need to have any specific damages, that all the CLRA requires is a breach. It's a very, very wide open, very charitable statute for claimants. But if that's true, then wouldn't they have Article III standing? Your Honor, I would respond to that in two ways. First, I would point you to the language I just read from Kagan, which says that a consumer does need to allege injury. And injury is defined very broadly under California law pursuant to Section 1770. But if you read that section, it requires that the plaintiff had been injured by a variety of practices ranging from unfair competition to breach of contract. California does not say that if a defendant goes ahead and remedies that, as was the case here, then the plaintiff can still bring a class action. The second thing I would point out is this Court in numerous cases, including the Cantrell case, which the plaintiff mentioned, has said the fact that a plaintiff can bring an action in state court doesn't mean that the plaintiff can also bring that action in federal court. The fact that California says, you know, we don't care if you're injured, come one, come all into our courts, doesn't mean that under Article III you can come in and bring that same claim in federal court just because California says you can. But we do have this Worth v. Seldin case that suggests that a violation of a statutory right in state, of a state law, would establish, is sufficient to establish an injury in fact. I mean, I read Kagan, and Kagan does have language indicating that there can be an injury in fact due to a violation of a statutory right and that this California law gives persons the right to be free from unspecified, from specified unlawful business practices. And so to the extent she wasn't free from those unlawful business practices and her right to be free from them under the California law was violated, it seems that there, at least as a matter of California law, she was injured, and under Worth v. Seldin that may be enough to create an injury in fact. Your Honor, I would respond to that by saying first, I don't think you can read Worth that broadly, especially in light of subsequent cases that have come down. If you look at some of the cases that the plaintiff has cited, a lot of them deal with statutes such as FOIA, or NEPA, or various other federal statutes where Congress has said, a violation of this procedural rule is enough to confer standing on a plaintiff, even in the absence of a traditional injury in fact, because the right to have the government follow that procedure is so important that we're going to let you sue to enforce it. And I think, I don't think that there is an intention on behalf of Congress or anyone else to treat a state consumer protection statute in that way. I would also reiterate what I've said before, which is that Sprint went ahead and, you know, despite contesting or believing that its charge was valid, Sprint went ahead and remedied this. Ms. Sisley is no longer by, you know, at the time she filed the suit, Ms. Sisley was no longer subject to any unfair practices from Sprint whatsoever. I don't quite understand how that curtain gets down on injury in fact for violation of statute of damages. In Worth v. Selvin, the Supreme Court said the actual or threatened injury required by Article III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing. I don't quite understand your position that somehow that doesn't apply to this case. Well, I think if you take Worth and subsequent cases of the Supreme Court's, Lujan, et cetera, in sequence, as well as the cases of this Court, for example, a plaintiff can't simply say, you know, I've been made whole, but nonetheless you violated my right before, and since you violated that right, I'm going to go sue you. I think you can bring an Article III case in the federal court based upon a state statute that's been violated, but if you've already entered into negotiations, you can't. I think what I'm saying, Your Honor, and I would point you to specific language in Cantrell that I don't have in front of me, where this Court says, yes, a plaintiff may bring a case in federal court based on an allegation of a violation of state law, but the plaintiff must allege a concomitant injury in fact. The plaintiff can't simply say, well, you know, Sprint did X, and I suffered no injury whatsoever, because then the plaintiff is not alleging that. If you said that, we may be in big trouble, because the Supreme Court said solely by virtue of the statute creating the right. And so what is the case that we are no longer going to be following, Worth against Selden? Well, I think, Your Honor, if you take — if you look at this Court's language in Cantrell, which was decided after Worth, it expresses the idea that, yes, you can claim a violation of state law as the basis of your federal — of a federal lawsuit, but you must also allege injury in fact. And I have not examined how Cantrell viewed Worth in particular, but I think the theme running through this Court's jurisprudence and as well as the Second Circuit's jurisprudence is that you must also allege an injury in fact, not simply a violation. And that's in Gonzales. Is that correct? I'm speaking about the Cantrell case. Which case? It is Cantrell v. City of Long Beach. Cantrell. 241F3rd674. Well, in Cantrell against Long Beach, we said that state law can create interests that support standing in federal courts. But then the Court went ahead and said only when there are allegations of injury in fact. If the Court will permit me, I'll just grab my — grab my brief and I can read you the specific passage I'm referencing. In that case, I mean, you may recall that when we wrote it, we did not explicitly adopt the position of the Seventh Circuit, but we did indicate some feeling that it's — that it's — has it right. And that has the more pointed language in it. The violation of state-created legal right can, in itself, satisfy the injury of fact requirement for standing under Article III. And that was — was looking at the FMC, Seventh Circuit case. So I don't think — I don't see how Cantrell carries you very far to indicate that even though there's been a violation of, in this case, CLRA, you still have to have something in addition for standing. It looks like to me that under Worth and Cantrell, you don't need anything but the violation. Now, I could be wrong on this. This is a very technical area. But I'd like to get your argument on that. Okay. Your Honor, I would — in the FMC case that you referenced, I think there the state statute that was being interpreted was similar to a NEPA or to a FOIA statute. There the state had said that, quote, the right to — there was a right to exclusively — a right to — I'm sorry, that the plaintiff was deprived of the right to exclusively control its confidential information. There, like FOIA, there was a state-created right to information. The plaintiff was denied that right. And this was, I would say, sort of a — it was a substantive right that was created by state law. It created a duty on the parties to protect certain information the same way that NEPA, you know, creates a duty for federal agencies to conduct environmental reviews before — But California doesn't — this California statute gives people the right to be free of this business practice. That's what Kagan said. I guess I don't see the distinction. I think the distinction is that, as the Court has recognized, the CLRA is, you know, is a very, very, very general statute. And basically, were we to say, well, California says you have a right to be free from unfair competition, whatever that is, and that would turn any plaintiff, you know, any consumer action in California, regardless of what the factual basis of it was, you know, be it breach of contract, unfair competition, anything, that would turn it into an Article III case, regardless of whether there was any injury. And I don't think that Article III is intended — Well, there is an injury that that's defined by the statute, just like the FMC case, like not getting — having the right to get the information. It's created by statute. So I guess I'm not understanding the distinction. I think the distinction is, in areas like the FMC case, or in NEPA, or in FOIA, there is something very specific. It says you must do X. And if you don't do X, this person can allege an injury. There is no such concrete or particularized statement in Kagan. Kagan is — But the CLRA, isn't that what it says? CLRA says any allegation of a violation of 1770, which then goes ahead and lists — it's a laundry list of very amorphous things. I don't think it has the particularity that exists in these other cases. And I think were you — were the court to read the CLRA so broadly, basically any California plaintiff, regardless of what happened, has suffered an injury, in fact, sufficient to confer Article III. But I would also point the court back to the language from Kagan that I pointed out earlier, which says basically once an individual plaintiff has obtained relief, which is exactly what happened here, he or she no longer has the ability to bring a CLRA claim. So this — And what's your case for that? That is within Kagan itself. It is — I don't have the page number cited, unfortunately, but it says, we agree that a consumer who has notified a prospective defendant of an individualized grievance, which is what Sisley did here, and has obtained his or her requested relief, cannot subsequently bring either an individual or a class action under the Act. Here, Sisley notified Sprint of her issue, namely these disputed charges. Sprint said, okay, here's the money back. Does that have to do with whether or not they can be a class, they represent a class, or does it do with Article III standing? I think it points to both, Your Honor, because in order to have Article III standing to represent a class, the plaintiff must herself be able to bring the action. And California law here, to the extent that the court's — you know, the court is considering whether the CLRA and an allegation of a violation of that law alone is sufficient to confer a standing, and with reference to California law, that passage I just read from Kagan says that, no, it's not. So what's your proposition is that under California law, even though they have a claim for CLRA, if they have already settled the case in some fashion, they can no longer have Article III standing or be a member of the class? Well, I think under California law, the issue is she doesn't have a CLRA claim anymore. I see what you're saying. Okay. And the case that I'm going to read is going to tell me that is — which case do you rely on for that? I'm relying on Kagan for that as well. That's the — it is — the site is 35 Cal III 582. Okay. At some time before your time is up, could you address the class action ruling? Yes, Your Honor. I will address that now. I think I would start with the proposition that the Supreme Court in General Telephone Company of Southwest v. Falcon said, sometimes the issues are plain enough from the pleadings to determine whether the interests of absent parties are fairly encompassed with the name plaintiff's claim. And the court went ahead and affirmed the dismissal of class action allegations at the pleading stage. And I don't — the court didn't qualify this statement. It didn't say when there are issues of choice of law or when there are issues of this or when there are issues of that. The court said, when it's obvious, the district court can go ahead and dismiss. And I think some of the issues that Your Honor raised earlier ring true. Here, this is — she's been made — Sprint would posit that she's been made whole. She doesn't have any standing to bring injunctive relief. She doesn't have any standing to seek damages. And she, therefore, cannot represent a class. I think I would also point out, and I understand that this issue was not raised in any of the briefs, but this is an issue of common questions of law and fact. Ms. Sisley's claim is that she was unhappy with Sprint. She switched over to MCI, another long-distance carrier. And Sprint kept billing her after she had made the switch. And she didn't want the Sprint services. Actually, her fiancé had called on her behalf and tried to get Sprint to refund the charges, which it did three times, and that she was damaged because she lost time. Certifying a class on this basis would require looking at every single plaintiff who did not cancel their Sprint service after Sprint instituted this minimum monthly charge. And you'd have to ask each plaintiff, did you want to continue your Sprint service? Did you object to this fee? Did you read the notice that told you about the fee and said, if you're not comfortable with this fee, please cancel it? There are too many individual factual issues here that would prevent a class from being certified. I would also, I think that sums up Sprint's position on the issue of class certification. With respect to certain other allegations regarding standing, I'd like to clear up the facts a little bit. I understand that they were probably a little bit murky. What happened here was Sprint decided it used to just say, okay, well, we're going to give you long-distance services and you can pay $0.05 a minute per call. And Sprint at some point changed its mind and said, you know, we're going to make this more like a gym membership. You're going to pay us $3 a month for access to our long-distance lines, and then the same way you pay extra for cardio or kickboxing classes in some gyms, you're also going to pay us $0.05 a minute for long-distance because it's better off for us that way. We think it makes more sense. Sprint then sent notice to its consumers and said, hey, here's what we're doing. If you're not happy, cancel it. And Ms. Disley either disregarded these notices, didn't read them. She never canceled her services with Sprint. So she gets a bill for $17.60, and she says, okay, I'm not happy about this. Her fiancé calls Sprint and says, you know, here, I obviously don't know the substance of the conversation entirely, but fiancé complains about the charges. Sprint refunds the charges. This happened three times. The reason that the refund issue, she was billed three times, the refund was issued three times, and that the charge didn't actually appear on her card until after Sprint issued the refund was that Ms. Disley had signed up for an automatic bill pay program with Sprint, whereby she'd get her bill and, you know, at a couple days before the due date her credit card would be automatically charged. Unfortunately, the first time Sprint tried to charge her the $17.60, her credit card was maxed out. Sprint couldn't make the charge, and as a result of the glitch in the billing system, when it refunded the charges, the credit card system, which is separate from the billing system, was still trying to charge the credit card, which is why this had to happen three times. The fact that the charge, I think, came, it was April 19th, I believe, and April 23rd, something like that, the charge was made four days later, that was because that was finally the time when Sprint was able to actually assess the $17.60. It had been trying to assess it all along, but was unable to do so because Ms. Disley's credit card was overdrawn. So there was no intent on Sprint's part, as counsel would suggest, to sort of for consumer goodwill to make you go away, we'll just give you this money. Sprint said, well, we're going to give you your $17.60 back and let's just be done with this. It ended up happening three times because of the automatic billing system and the fact that her credit card was overdrawn. So could I ask you on, we ran your associate over, so your lunch will be delayed just a minute or two, but I'll try to be brief. We haven't talked to you about Article III standing when there's an amount involved, that is the de minimis issue. There's some who believe that in federal jurisdiction, it's a straight line. I mean, it's never de minimis. If you have a federal claim, even though it's a small claim, you're entitled to come to federal court. What's your position on whether $5 or $10 is enough or whether it has to have a certain level of amount before we have Article III standing? Well, Your Honor, I think that, as co-counsel has pointed out, the case law is pretty clear that there is no minimum amount of damages a plaintiff has to suffer. For example, you have to suffer more than $0.05, but I think when you look at the court's decision in the Meridian case, that case is almost exactly on point with what happened here. There, the plaintiff went to a hotel and he needed an accessible shower with a chair. He received neither a roll-in shower nor a chair until the next morning. And the court, in ruling that the plaintiff had Article III standing, said, look, these allegations, the fact that you went without access to the shower for however many hours it was, they remedied it the next day. They did what they could to fix it. You were essentially made whole on that point. We're not going to base our standing decisions on that. The court said there was standing because the plaintiff encountered obstacles. I believe there were issues with some of the paths that were not accessible and there were issues in other parts of the building. The court said, look, we understand this was a problem. The defendant went ahead and remedied it for you, and you can't claim standing on that basis. I think based on the facts of this case, what Ms. Sisley is claiming, a plaintiff would never lose standing unless every time you call your bank or you call the telephone company or you call the newspaper delivery company and you say, hey, you know, I shouldn't have been charged this, or you charged me too much here, and they refund it, you'd have to say, they'd have to say, oh, and, you know, let's find out what do you do for a living, how much time did you spend on this, let me compensate you. If you bill, you know, $200 an hour and you spent 30 minutes on this, let me give you back your $3.50, but let me also give you that $100 so I can make sure that you don't sue me. And I think that that's getting to the point of absurdity, and that's not what the law requires. I think when you have a case such as here where the plaintiff spent, and actually it's unclear from the complaint how the plaintiff spent any time because it was her fiancé actually and not her who made all the calls to Sprint, you know. One final question on Rule 11 sanctions. The district judge brought sanctions because the complaint was frivolous. I want you to assume just for sake of argument that the CLRA claim is not frivolous, that all the rest of them were, but one was not. Would we then hold that the district judge abused, the district court abused its discretion, or would we say that on the whole it's okay to have the sanctions? That is, are sanctions saved if you have one claim that's non-frivolous? Your Honor, I believe for Rule 11 the answer to that question is no. I know that Federal Rule of Appellate Procedure 38 sanctions are treated somewhat differently, but Federal Rule 11, Federal Rule of Civil Procedure 11 requires that counsel sign a pleading and basically swear that it is not frivolous and that the allegations contained therein have merit. And am I correct? I'm supposed to assume that the CLRA claim had merit in everything? Assume that one out of four claims has merit. Assume. Okay. Well, I think the issue is to the extent that that claim is severable, counsel still pressed knowingly frivolous claims in three iterations of a complaint, took up a considerable amount of time in both the district court level here and of the parties. Your argument would be that if the judge found four were frivolous, we decide three are, then the same we would still affirm as no abuse of discretion? I believe so, although to be honest, I did not review that aspect of the case law before coming in today. I would be happy to provide the Court with some supplemental briefing on that. No, it's all right. I just wondered if you have a point of view. I don't even know if we're going to get to it, but it was a matter of curiosity. Thanks for your help. Thank you. If I may take the minute that the Court had offered me before. With respect to Kagan, the Court of Appeal is very clear there at page 595 about the clear legislative intent of the CLRA against prospective defendants trying to avert a class by exempting or picking off prospective plaintiffs one by one. But how is it a picking off of the plaintiff if they make the refund, you know, before there's a lawsuit filed? Well, usually when consumers escalate, the sophisticated defendants who have been sued in class actions like Sprint has before, they understand that consumers, if they're not happy, they may eventually get to a class action. So if they just keep on, you know, I forget the name of the game, but just hitting every consumer once their head pops out, then there will be no class action. But here, what happened, and Kagan itself holds that when a prospective defendant has noticed that the problem doesn't affect just one person but affects many people, then the defendant cannot get off the hook by just taking care of that one person whose head popped up, but instead has to take care of all the others when it knows that the problem affects everybody. And in fact, in our complaint, we specifically allege that when Sisley's fiancé called Sprint, the person said, sorry about this, we know this is happening to a lot of other people, we'll try to fix the problem, but they haven't fixed the problem. They haven't provided a refund. There's no evidence that they have. And therefore, given that they haven't cured the problem from everyone, then our position is that they can't get off the hook by just taking care and picking off one plaintiff. And in fact, the CLRA also provides Sisley with the right to injunctive relief, not just damages, but the right to injunctive relief. Now, counsel said that the plaintiff in Kagan was picked off after she filed the suit. That's false. What happened in Kagan was she was misrepresented to. They never took a dime, a penny from her bank account at all. There was no picking off of the plaintiff in Kagan. There was simply a misrepresentation. Nothing happened to her account. Just a misrepresentation. But that was enough, because they didn't take care of everybody else who suffered. And not only does the CLRA give the right to statutory damages, it also gives you the right to injunctive relief. So even if plaintiff Sisley doesn't have a right to damages, she has a right to injunctive relief. And the cases that we cite in our brief hold that you can have injunctive relief even though the defendant ceased practices in the past. I know there's some difference between Article, you know, in Article III, just generally the right to injunctive relief when there's no future threat. But the likes, looking at the likes in California and the CLRA, it is that you do have a right to seek injunctive relief even if the practices have only occurred in the past and have stopped. And therefore, I think we have injury in effect and would like the Court to also, of course, reverse the rule of intentional disorder. Thank you. Thank you. This case is submitted and we're adjourned.
judges: Wallace, Gould, Ikuta